IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Scott T. Solem, d/b/a <br> Solem Law Offices, <br>  <br>                  Plaintiff, <br>  <br> vs. <br>  <br> ALPS Property & Casualty <br> Insurance Company, <br>  <br>                  Defendant. | **ORDER GRANTING** <br> **DEFENDANT'S MOTION FOR** <br> **SUMMARY JUDGMENT** <br>  <br>  <br> Case No. 1:22-cv-212 |

Before the Court is the Defendant's motion for summary judgment filed on September 6, 2023. See Doc. No. 17. The Plaintiff filed a response in opposition to the motion and cross motion for summary judgment on September 27, 2023. See Doc. Nos. 19 and 20. The Defendant filed a combined response and reply brief on October 19, 2023. See Doc. No. 23. For the reasons set forth below, the Defendant's motion for summary judgment is granted and the Plaintiff's motion for summary judgment is denied.

**I.    BACKGROUND**

This case arises out of a fraudulent check scheme perpetrated against the Solem Law Offices and its sole proprietor, Scott Solem (collectively, "Solem"), and the refusal of his professional liability insurer, ALPS Property & Casualty Insurance Company ("ALPS"), to cover the loss. The facts are undisputed and show as follows.

On November 6, 2020, an associate with the Solem Law Offices, located in Beulah, North Dakota, received an email in a work email account from an individual who identified himself as

1

Stephen Kersey requesting legal assistance. On November 10, 2020, Kersey explained in another email that he worked for Anthem Equipment, Inc. ("Anthem") and needed assistance collecting a debt owed by Ace Machine Inc. ("Ace") to Anthem. On November 11, 2020, the associate, on behalf of the Solem Law Offices executed a fee agreement with Anthem. On December 1, 2020, the Solem Law Offices received a Citibank cashier's check dated November 19, 2020, and made payable to the Solem Law Offices in the amount of $198,850.00 ("Check"). On December 1, 2020, the Solem Law Offices deposited the Check in the firm's IOLTA account with First Security Bank-West in Beulah, North Dakota ("First Security Bank-West"). On December 3, 2020, the Solem Law Offices received wire instructions from Kersey directing the Solem Law Offices to wire $198,336.68 to a Bank of America account in Phoenix, Arizona, owned by ACE Telecom, Inc. On December 3, 2020, the Solem Law Offices instructed First Security Bank-West to wire $198,336.68 from the Solem Firm's IOLTA account to the Bank of America account owned by ACE Telecom. The funds were wired as instructed. On December 5, 2020, the Solem Law Offices received a telephone call from First Security Bank-West advising them the Check deposited by Solem on December 1, 2020, had been flagged as possibly fraudulent. The Check was later confirmed to be counterfeit.

      Solem contacted the Beulah Chief of Police, the FBI, and the North Dakota Attorney General, among others, in an attempt to recover the funds wired to the ACE Telecom Bank of America account in Phoenix. Solem transferred $98,850.00 from his general office account along with $100,000 he borrowed from First Security Bank-West to the firm's IOLTA account to cover the trust account shortage caused by the fraud. Of the $198,336.68 wired on December 3, 2020, $15,969.07 was recovered, returned to First Security Bank-West on or around March 28, 2021, and applied to a loan from First Security Bank-West to Solem. Attempts to contact Anthem or otherwise obtain

return of the trust account funds from Anthem were unsuccessful. The result of the fraudulent scheme perpetrated by unknown persons was a loss to the Solem Law Offices of $182,367.61. None of the Solem Law Offices clients experienced any loss.

At all times relevant to this case, the Solem Law Offices were insured by ALPS Professional Liability Insurance Policy No. ALPS19462-5 ("Policy") issued by ALPS to the Solem Law Offices for the policy period September 15, 2020, to September 15, 2021. Scott T. Solem is listed as an individual attorney insured under the Policy, as is the associate who executed the fee agreement with Anthem. The Policy provides legal professional liability insurance on a claims made and reported basis.

On December 7, 2020, the Solem Law Office submitted a claim to ALPS related to the fraudulent check scheme described above in the amount of $182,367.61. On December 8, 2020, ALPS acknowledged the December 7, 2020, claim and provided Solem with ALPS's preliminary position denying coverage. On November 29, 2022, Solem filed suit against ALPS in state court in North Dakota. On December 1, 2022, ALPS again denied coverage and demanded the state court lawsuit be dismissed. On December 21, 2022, ALPS removed the action to federal court and filed its answer. The jurisdictional basis for removal was diversity of citizenship. Solem is a citizen of North Dakota. ALPS is a citizen of Montana. Both parties have now moved for summary judgment.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. Davison v. City of Minneapolis, 490 F.3d 648, 654 (8th

Cir. 2007); see Fed. R. Civ. P. 56(a).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.  Id.  The purpose of summary judgment is to assess the evidence and determine if a trial is genuinely necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law.  Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).  The moving party bears the responsibility of informing the court of the basis for the motion and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).  The non-moving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial.  Id.; Fed. R. Civ. P. 56(c)(1). If the record taken as a whole and viewed in a light most favorable to the non-moving party could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial and summary judgment is appropriate.  Matsushita, 475 U.S. at 587.

### III.   LEGAL DISCUSSION

ALPS contends in its motion for summary judgment that the Policy does not afford coverage because (1) no "claim" was made against Solem; (2) Solem did not perform any "professional services" as defined by the Policy; (3) the Policy contains an exclusion for losses occasioned by the

4

conversion, misappropriation, or wrongful disbursement of trust account funds; (4) the Policy contains a second exclusion for any claim related to funds controlled by the insured; and (5) the recovery sought does not fall within the Policy's definition of "damages." Solem maintains the Policy affords coverage.

It is undisputed that North Dakota law applies to this diversity action. See Guardian Fiberglass, Inc. v. Whit Davis Lumber Co., 509 F.3d 512, 515 (8th Cir. 2007) (federal district court sitting in diversity must apply the forum state's substantive law). Under North Dakota law, insurance policies are construed like any other contract. Nationwide Mut. Ins. Cos. v. Lagodinski, 683 N.W.2d 903, 907 (N.D. 2004). The goal is to give effect to the mutual intention of the parties. The Court must first look to the language of the policy and, if it is clear, there is no room for construction. Id. Undefined terms are given their plain and ordinary meaning. Id. Insurance policies are regarded as contracts of adhesion with ambiguity resolved in favor of the insured. Id. The Court must not strain the definition of an undefined term or rewrite an unambiguous policy to provide coverage. The policy must be construed as a whole, giving meaning and effect to each clause, if possible. Id. at 907. Exclusions from coverage must be clear and explicit and are strictly construed against the insurer. Id. The Court must not rewrite the contract to find coverage where the exclusion unambiguously excludes coverage. Id. A court interpreting an insurance policy must first examine the coverages provided by the policy before examining the policy's exclusions. K & L Homes, Inc. v. Am. Fam. Mut. Ins. Co., 829 N.W.2d 724, 728 (N.D. 2013). Neither this Court nor the Eighth Circuit Court of Appeals has addressed the precise coverage issue presented by which an insured seeks reimbursement under a third-party professional liability policy for the insured's loss - trust account funds lost to a criminal actor - even though no client or any other entity has made a

5

claim against the insured.

### A. <u>Coverage</u>

ALPS contends that because no client of Solem ever made a claim against the firm, no professional services were rendered, and no damages were incurred related to the fraudulent check scheme, there can be no recovery under the policy for the loss. Solem contends that when a lawyer distributes trust account funds without client authorization the client has a claim for malpractice, and the fact the attorney restored the funds before the claim was made does not negate coverage.

The Policy's insuring agreement states, in relevant part:

> Subject to the Limit of Liability, exclusions, conditions and other terms of this Policy, the Company agrees to pay on behalf of the Insured all sums (in excess of the Deductible amount) that the Insured becomes legally obligated to pay as Damages, arising from or in connection with A CLAIM FIRST MADE AGAINST THE INSURED AND FIRST REPORTED TO THE COMPANY DURING THE POLICY PERIOD…

See Doc. No. 3-1, p. 11. The Policy defines "claim" as "a demand for money or services including, but not necessarily limited to, the service of suit or institution of arbitration or alternative dispute resolution proceedings against the Insured." See Doc. No. 3-1, p. 12. "Professional services" are defined in the Policy as, in pertinent part, "services or activities . . . rendered solely to others as . . . [a]n Attorney in an attorney-client relationship on behalf of one or more clients applying the Attorney's specialized education, knowledge, skill, labor, experience and/or training, including pro bono services" and "[a]n administrator, conservator, guardian, executor, personal representative, trustee or other fiduciary." See Doc. No. 3-1, p. 16. "Damages" are defined in the Policy, in relevant part, as any "[m]onetary award by way of judgment or final arbitration, or any settlement." See Doc.

6

No. 3-1, p. 14. The Policy excludes from the definition of "Damages," in relevant part, [r]estitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses paid to or charged by an Insured, or any other funds or property of any person or entity presently or formerly held or in any manner directly or indirectly controlled by an Insured or [i]njury or damage to, destruction of, loss of, or loss of use of any funds or property[.] See Doc. No. 3-1, p. 14.

The precise coverage issue in this case has never been addressed by the Eighth Circuit Court of Appeals or the North Dakota Supreme Court. Other courts have addressed the issue and come to differing conclusions. See Nardella Chong, P.A. v. Medmarc Cas. Ins. Co., 642 F.3d 941 (11th Cir. 2011) (finding policy provided coverage); O'Brien & Wolf, L.L.P. v. Liberty Ins. Underwriters, Inc., No. CIV. 11-3748, 2012 WL 3156802 (D. Minn. Aug. 3, 2012) (finding policy provided coverage); Bradford & Bradford, P.A. v. Att'ys Liab. Prot. Soc., Inc., No. 0:09-CV-02981, 2010 WL 4225907 (D.S.C. Oct. 20, 2010) (finding no coverage); Yadlon v. Cont'l Cas. Co., No. 06-CV-05617, 2008 WL 11510298 (D.N.J. July 17, 2008) (finding no coverage). The Court has carefully reviewed all of these cases and finds *Nardella* and *O'Brien* to be persuasive. The management of client trust funds is undoubtedly a professional service regularly performed by attorneys, and it would be unconscionable to interpret a professional liability policy to require an attorney to breach his ethical duties in order to generate a claim so that coverage is available.

In *Nardella*, a client purported to hire the law firm to establish a U.S. subsidiary. Nardella Chong, P.A., 642 F.3d at 942. The client provided the firm a cashier's check in payment which was deposited in the firm trust account. Id. The client then instructed that most of the funds from the cashier's check should be wired to an overseas business partner. Id. After the firm wired the funds, it found out the cashier's check had been forged. Id. The funds that were wired belonged to other

7

clients. The professional liability insurer denied coverage. The district court agreed with the insurer that there was no coverage because there had been no negligent acts or omissions and the other client's potential claims would be in the nature of restitution rather than damages. The Eleventh Circuit Court of Appeals reversed and found there was coverage. The Eleventh Circuit explained that the deposit of client funds into a trust account and the management of those funds is a "professional service." Id. Such services are traditionally performed by attorneys in a fiduciary capacity and are governed by the rules of professional conduct. Id. at 943. The Eleventh Circuit found that claims for negligent management of a trust account are covered, "including those that could have been asserted." The insurer gave its permission for the firm to replace the trust funds fraudulently diverted in order to avoid the filing of any malpractice claims and no arguments were presented as between actual and potential claims. Id. The Eleventh Circuit also rejected the idea that such malpractice claims would be for restitution rather than damages because a malpractice case for trust fund negligence gives rise to an action for damages, not restitution. Id.

In *O'Brien*, a law firm was contacted by a potential client seeking help to collect a debt. O'Brien & Wolf, 2012 WL 3156802, at *1. The debtor agreed to a payment plan and sent the law firm a check which was deposited in the firm's trust account. Id. After the bank twice confirmed the check had cleared, the firm distributed the funds as instructed by the client. The bank then informed the firm the check was counterfeit and debited the firm's trust account for the amount of the check. Realizing it was in violation of Minnesota Rule of Professional Conduct 1.15, the firm immediately reimbursed the trust account. The firm then made a claim with its malpractice carrier which took no action on the claim. The insurer maintained the firm had not provided any "professional services" and no "claim" had been filed against the firm. Id. at *2. The policy defined

a "claim" as "demand received." Id. at *3. The court found the term "demand" to be ambiguous. Id. The Court also found the rules of professional conduct required the firm to safeguard client funds and make restitution to its clients immediately upon discovery of the loss. Id. at *3-4. Critically, the Court found the rules of professional conduct operated as a "demand" for reimbursement of the firm's trust account under a broad reading of the malpractice policy. Id. at *4. The Court emphasized that it "refuses to interpret the policy to require O'Brien & Wolf to breach its ethical duties to its clients, and thereby subject itself to certain discipline, in order to ensure coverage under its malpractice insurance." Id. The Court explained that managing a client trust account creates a fiduciary relationship between lawyer and client that constitutes the provision of "professional legal services." Id. at *5. The Court also found the firm had suffered a full and final amount of loss which were recoverable damages under the policy. Id. at *4

This Court has no difficulty concluding that the management of client funds in a trust account constitutes the provision of professional services. Nardella Chong, P.A., 642 F.3d at 942-43. Rule 1.15 of the North Dakota Rules of Professional Conduct makes it clear to any attorney that keeping client funds creates a fiduciary relationship between the attorney and the client. N.D.R. Prof. Conduct. 1.15. Comment 1 to Rule 1.15 states "[a] lawyer should hold property of others with the care required of a professional fiduciary." The Policy defines "professional services" to include services rendered as a "trustee or other fiduciary." See Doc. No. 3-1, p. 16. Thus, Solem did render "professional services."

The Policy contains the same ambiguous definition of "claim" as the policy in *O'Brien*. A "claim" "means a demand for money or services including, but not necessarily limited to, the service of suit or institution of arbitration or alternative dispute resolution proceedings against the insured."

9

See Doc. No. 3-1, p. 12. The term "demand" is not defined. See Doc. No. 3-1, p. 12. Black's Law Dictionary defines demand as "[t]he assertion of a legal or procedural right. Demand, Black' Law Dictionary (11th ed. 2019). The Court finds the undefined term "demand" to be ambiguous. See O'Brien & Wolf, 2012 WL 3156802, at *3. "The duty to properly safeguard client funds is an ongoing and preexisting demand on all licensed attorneys." Id. at *4 (emphasis added). Violation of Rule 1.15 may result in disbarment. In re Disciplinary Action Against Buresh, 726 N.W.2d 210, 214 (N.D. 2007). "Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client" and "suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client." In re Disciplinary Action Against McDonagh, 822 N.W.2d 468, 470 (N.D. 2012). Prompt voluntary restitution is an important mitigating factor is disciplinary actions. Matter of Disciplinary Action Against Becker, 504 N.W.2d 303, 306 (N.D. 1993). The Court concludes the Policy's requirement of a "demand" encompasses Rule 1.15's standing requirement to safeguard client funds held in a trust account, thus there was a "claim" which triggered coverage. O'Brien & Wolf, 2012 WL 3156802, at *4.

As for damages, the amount in question was an undisputed sum certain. The immediate reimbursement made by Solem amounted to a settlement and was required by Rule 1.15 of the North Dakota Rules of Professional Conduct. Again, the Court refuses to interpret any provision of the Policy in a way which requires Solem to abandon his ethical duties. O'Brien & Wolf, 2012 WL 3156802, at *4. Solem was ethically and legally obligated to make immediate reimbursement to his firm trust account. Clearly, there were damages. ALPS' construction of the Policy requires Solem to breach his ethical duties, allow an action against him for malpractice to go forward and be reduced

to a judgment, before filing a claim. Such a construction would undermine the very purpose disciplinary proceedings and the Rules of Professional Conduct upon which they are based, which is to protect the public. See Matter of Reinstatement of Varriano, 909 N.W.2d 695, 700 (N.D. 2018). "Public policy is a principle of law whereby contracts will not be enforced if they have a tendency to be injurious to the public or against the public good." Cf. Meyer v. Hawkinson, 626 N.W.2d 262, 267 (N.D. 2001). Professional liability insurance is a contract not just between a lawyer and his insurer "but also a contract for the benefit of the public." O'Brien & Wolf, 2012 WL 3156802, at *8. The Court finds that Solem suffered damages covered by the Policy.

ALPS relies primarily on *Yadlon*, an unpublished opinion decided prior to *Nardella* and *O'Brien,* in arguing there is no coverage because no claim was made against Solem. In *Yadlon*, an attorney failed to reconcile his trust account for two years and upon doing so learned a substantial amount of funds were missing and likely stolen using forged checks. Yadlon, 2008 WL 11510298, at *1. The attorney made good the loss from his own funds and sought coverage under his professional liability insurance policy. Id. The insurer denied coverage and the law firm filed a lawsuit. Id. The court granted summary judgment in favor of the insurer finding no claim or demand had been filed against the lawyer by his clients. Id. at *2. The Court further explained that the purpose of third-party insurance is to protect insureds from claims made against them as a result of their own conduct. Id. at *3. The Court commended the lawyer for making good the loss but pointed to his own negligence in permitting the loss to occur. Id. The Court did not address the lawyers' ethical obligations under the rules of professional conduct to make good the funds stolen from his trust account.

The problem with the reasoning in *Yadlon* is there certainly was a viable claim against the

attorney for malpractice based on the theft of client funds and that claim existed until the attorney made good the loss. Had the attorney not done so there certainly would have been a claim against him for malpractice. *Yadlon* requires the attorney to choose between performing his ethical duty under the rules of professional conduct by making good the loss and forgoing coverage or ignoring his ethical obligations and then being able to turn to his insurer for coverage. *Yadlon* was decided before *Nardella* and *O'Brien* and the case does not address the lawyers' ethical obligations under the rules of professional conduct. *Nardella* and *O'Brien* do not require an ethical breach in order to obtain coverage and the Court firmly believes these opinions offer the better rule. ALPS also cites to *Bradford & Bradford, P.A. v. Att'ys Liab. Prot. Soc., Inc.*, No. 09-CV-02981, 2010 WL 4225907 (D.S.C. Oct. 20, 2010), which the Court finds unpersuasive for the same reasons as *Yadlon*.

ALPS would force Solem to make the same Hobson's choice the courts rejected in *Nardella* and *O'Brien*. To force a lawyer to violate his ethical duties and face certain discipline and possible disbarment in order to obtain insurance coverage strikes the Court as unconscionable. "[C]ourts prefer a reasonable and lawful interpretation of the contract over one that is unreasonable or unlawful." O'Brien & Wolf, 2012 WL 3156802, at *3. This Court, like the court in *O'Brien,* refuses to read the Policy to require Solem to violate his ethical duties to his clients in order to obtain coverage. Id. at *4. The Court finds the fraud visited upon Solem is expressly covered by the Insuring Agreement in Section 1 of the Policy.

### B.   **Exclusions**

Having determined there is coverage under the Policy, the Court must next determine if either of the exclusions cited by ALPS apply. In North Dakota, exclusions "must be clear and explicit and

are strictly construed against the insurer." Forsman v. Blues, Brews & Bar-B-Ques, Inc., 903 N.W.2d 524, 530 (N.D. 2017). "While exclusionary clauses are strictly construed, a contract will not be rewritten to impose liability when the policy unambiguously precludes coverage." Id. at 531. The burden is on the insurer to establish the applicability of an exclusion. Id.

In this case, Section 3 of the Policy contains multiple exclusions. The two exclusions at issue (H and I) provide as follows:

> THIS POLICY DOES NOT APPLY TO ANY CLAIM ARISING FROM OR IN CONNECTION WITH:
>
> H. Any conversion, misappropriation, wrongful disbursement, improper commingling or negligent supervision by any person of client or trust account funds or property, or funds or property of any other person, held or controlled at any time by an Insured in any capacity or under any authority, including any loss or reduction in value of such funds or property;
>
> I. Any dispute over fees or costs, or any Claim that seeks, whether directly or indirectly, the return, reimbursement or disgorgement of fees, costs, or other funds or property held or controlled at any time by an Insured;

ALPS contends these exclusions clearly and unambiguously preclude coverage of the claims in this case. Solem contends the exclusions are void as against public policy. The loss in this case undisputedly arose from the misappropriation and/or wrongful disbursement of funds held in the Solem trust account. Thus, the funds were controlled by Solem. The funds were stolen by means of a fraudulent check scam that, as the case law reveals, has become a frequent occurrence in the legal community. The Court sees no ambiguity in the exclusions. Similar exclusions have been held to be unambiguous and to exclude coverage in a number of cases involving fraudulent schemes. See Att'ys Liab. Prot. Soc'y, Inc. v. Whittington Law Assocs., PLLC, 961 F. Supp. 2d 367, 372 (D.N.H. 2013) (finding similar exclusion was "clear and unambiguous" and applied in the case of a check

fraud scheme to the misappropriation of funds under the control of a law firm); ALPS Prop. & Cas. Ins. Co. v. Murphy, 473 F. Supp. 3d 585, 592-593 (N.D. W. Va. 2020) (finding an identical exclusion in an ALPS policy was "broad" and excluded coverage for settlement payment lost to a third party who provided fraudulent wire instructions to law firm); Fid. Nat'l Title Ins. Co. of N.Y. v. OHIC Ins. Co., 619 S.E.2d 704, 707 (Ga. Ct. App. 2005) (finding a similar exclusion in a professional liability policy applied to claims arising out of conversion, misappropriation, or improper commingling of client funds held in a lawyer trust account were stolen by an employee); Acct. Res., Inc. v. Hiscox, Inc., No. 15-cv-01764, 2016 WL 5844465 (D. Conn. Sept. 30, 2016) (finding similar exclusion excluded a claim that arose from a theft of funds from an accounting firm by computer hackers using fraudulent emails requesting payment for vendors).  The Court finds no ambiguity in the exclusions 3.H and 3.I.

Solem's argument regarding public policy fails to persuade because the exclusions, unlike the other Policy provisions cited by ALPS, do not incentivize a lawyer to violate his ethical obligations in order maintain a claim under the Policy.  The Court is not aware of, and Solem has not drawn the Court's attention to, any case law supporting the contention that an exclusion which excludes certain negligent acts is a violation of public policy.  An attorney cannot expect a professional liability policy to cover that which a policy specifically and unambiguously excludes. The Court finds exclusions 3.H and 3.I clearly apply to exclude coverage in this case.  Because the exclusions apply, Solem's motion for summary judgment fails.[1]

---

[1] The Court is sympathetic to the dilemma faced by the Plaintiff in this case.  One other possibility for coverage is a claim under the firm's CGL policy.

14

## IV.     CONCLUSION

The Court has carefully reviewed the record, the parties' briefs, and the relevant case law. For the reasons set forth above, the Defendant's motion for summary judgment (Doc. No. 17) is **GRANTED** and the Plaintiff's motion for summary judgment (Doc. No. 20) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 30th day of January, 2024.

>                     */s/  Daniel L. Hovland*
>                     Daniel L. Hovland, District Judge
>                     United States District Court